**IN THE UNITED STATES DISTRICT COURT OF KANSAS**

PAUL JOHNSON,                                    )
                                                 )
      Plaintiff,                        )
                                                 )
v.                                               )     Case No.      6:25-cv-1140
                                                 )
JEFF ZMUDA, in his individual capacity as        )
Secretary of Corrections,                        )
                                                 )
Serve at:                                        )
                                                 )
714 SW Jackson, Suite 300                        )
Topeka, Kansas 66603                             )
                                                 )
      and,                              )
                                                 )
PAUL SNYDER, in his individual capacity as       )
Warden of Winfield Correctional Facility,        )
                                                 )
Serve at:                                        )
                                                 )
1806 Pinecrest Circle                            )
Winfield, Kansas 67156                           )
                                                 )
      and,                              )
                                                 )
CENTURION OF KANSAS, LLC,                         )
                                                 )
Serve at:                                        )
                                                 )
112 SW 7th Street, Suite 3C                       )
Topeka, KS 66603                                 )
                                                 )
      and,                              )
                                                 )
RITA GUMM, APRN,                                 )
                                                 )
Serve at:                                        )
                                                 )
1800 Pinecrest Circle                            )
Winfield, Kansas 67156                           )
                                                 )
      and,                              )
                                                 )

1

JENA LEE, MD,                              )
                                          )
Serve at:                                 )
                                          )
1800 Pinecrest Circle                     )
Winfield, Kansas 67156                    )
                                          )
        and,                              )
                                          )
RENAE SCHULER, MD,                        )
                                          )
Serve at:                                 )
                                          )
1800 Pinecrest Circle                     )
Winfield, Kansas 67156                    )
                                          )
        and,                              )
                                          )
BRYAN WILSON, MD,                         )
                                          )
Serve at:                                 )
                                          )
1800 Pinecrest Circle                     )
Winfield, Kansas 67156                    )
                                          )
        Defendants.                       )

## **COMPLAINT**

1.      Plaintiff brings this suit to seek compensation and redress for pain and suffering following a serious back injury at Winfield Correctional Facility.

2.      This case arises from the gross medical negligence and deliberate indifference of Defendants Jeff Zmuda, Paul Snyder, Centurion of Kansas, LLC, Rita Gumm, APRN, Jena Lee, MD, Renae Schuler, MD, and Bryan Wilson, MD, whose failure to properly diagnose, treat, and supervise the medical care of Plaintiff resulted in permanent neurological damage, loss of mobility, and severe pain and suffering.

3.      This lawsuit includes an action for damages brought to redress injuries and the deprivation, under color of state law, of rights and privileges secured to Mr. Johnson by the laws of the State of Kansas and 42 U.S.C. § 1983.

4.      Mr. Johnson's worsening health condition and eventual emergency surgery was the product of Defendants' collective and cooperative promulgation, tacit authorization, and application of official departmental, institutional, and corporate policies, procedures, practices and customs that not only contemplate a deliberate and systematic disregard for known, obvious and excessive risks to inmate health and safety, but culminated in *de facto* denial of access to medical care and treatment for Mr. Johnson and the Winfield Correctional Facility as a whole.

## Parties

5.      At all relevant times, Paul Johnson was an inmate at Winfield Correctional Facility.

6.      Defendant Jeff Zmuda ("Zmuda" or "Secretary") is the Secretary of Corrections of the Kansas Department of Corrections, which oversees the Winfield Correctional Facility ("WCF") where Mr. Johnson was injured and Defendant Centurion of Kansas, LLC.

7.      Defendant Paul Snyder ("Warden" or "Snyder") is the Warden of WCF, and he oversees and supervises operations and employees at the WCF where Mr. Johnson was injured.

8.      Defendant Centurion of Kansas, LLC, ("Centurion") is a Kansas limited liability company that contracted with the State of Kansas to provide medical services at WCF. At all pertinent times, Defendant Centurion was an agent of the State of Kansas, the KDOC and WCF and held itself out as a professional health care provider with specialized expertise in providing medical care in correctional facilities. As such, at all material times, and while acting under color of state law, Centurion not only materially participated in the promulgation of official policies, but

it was also contractually obligated to train, supervise, direct and control all institutional and medical personnel.

9.      Defendant Rita Gumm is an Advanced Practiced Registered Nurse licensed in Kansas acting as an agent and/or employee of Defendants Centurion, Zmuda and/or Snyder to provide medical services to the WCF population, which included Mr. Johnson.

10.     Defendant Dr. Jena Lee is a physician licensed in Kansas acting as an agent and/or employee of Defendants Centurion, Zmuda and/or Snyder to provide medical services to the WCF population, which included Mr. Johnson.

11.     Defendant Dr. Renae Schuler is a physician licensed in Kansas acting as an agent and/or employee of Defendants Centurion, Zmuda and/or Snyder to provide medical services to the WCF population, which included Mr. Johnson.

12.     Defendant Dr. Bryan Wilson is a physician licensed in Kansas acting as an agent and/or employee of Defendants Centurion, Zmuda and/or Snyder to provide medical services to the WCF population, which included Mr. Johnson.

## Jurisdiction and Venue

13.     The Court has personal jurisdiction over Defendants because they reside in the State of Kansas and because their conduct described herein occurred exclusively in Winfield, Kansas.

14.     Venue is proper in this Court because Mr. Johnson's injuries and damages occurred in Winfield, in the Nineteenth Judicial District, Defendants reside and conduct business in Winfield, in the Nineteenth Judicial District, and all of the occurrences described herein occurred in Winfield.

## Background Allegations

15.    At all relevant times, Mr. Johnson was incarcerated at the Winfield Correctional Facility.

16.    On or about June 9, 2023, while working in the kitchen at Winfield Correctional Facility, Mr. Johnson sustained a back injury while lifting a heavy container in the prison kitchen with a co-worker.

17.    The co-worker lost his grip on the container, causing the full weight to shift onto Mr. Johnson, resulting in immediate pain in his mid-lower back.

18.    At all relevant times, Defendants Zmuda, Snyder and Centurion had actual knowledge of the need to train their employees to recognize the need for medical monitoring, medical intervention, medical evaluations and the provision and prescription of medicine.

19.    On June 11, 2023, Mr. Johnson sought medical attention at the WCF clinic, complaining of sharp, radiating pain down his right leg.

20.    The attending nurse, Michelle Suttles, noted full range of motion but pain upon bending and offered a muscle rub, which Mr. Johnson declined.

21.    Despite the significant mechanism of injury and clear signs of potential spinal involvement, no imaging, neurological testing, or further evaluation was ordered.

22.    Mr. Johnson was not prescribed any new medication and was instead advised to continue taking aspirin and acetaminophen.

23.    On June 12, 2023, Mr. Johnson returned to the clinic with worsening pain, difficulty standing, and an inability to control his symptoms, stating he had been sent home from work due to the severity of his symptoms.

24.     Despite his increasing pain, he was only prescribed heat, rest, and continuation of current medications – again, without any imaging, lab work, further diagnostic testing or referral for specialist evaluation.

25.     On June 14, 2023, Mr. Johnson reported difficulty walking, pain radiating down his right leg, and new urinary symptoms, which should have prompted urgent spinal evaluation.

26.     On June 15, 2023, Mr. Johnson fell in the bathroom and hit his left shoulder, lower back and head, yet WCF and Centurion staff did not order further neurological assessment or imaging.

27.     Despite the fall and continued deterioration, medical staff downplayed Mr. Johnson's symptoms, merely restricting his activities instead of investigating the cause of his worsening condition.

28.     By June 21, 2023, Mr. Johnson's condition had worsened to the point where he could not move without assistance and was visibly pale and shaking from pain.

29.     A nurse emergency response team was called when Mr. Johnson was observed standing at his bunk in extreme pain, unable to move.

30.     Despite these clear indicators of serious spinal cord injury, WCF and Centurion staff continued to dismiss his symptoms as exaggerated or malingering.

31.     APRN Rita Gumm suggested that Mr. Johnson was fabricating symptoms to secure disability benefits.

32.     Mr. Johnson was given a Toradol injection, but no imaging, lab work, or further diagnostic testing was ordered.

33.     Later that day on June 21, 2023, Mr. Johnson could no longer move his extremities and was unable to urinate.

34.    That same day, Dr. Jena Lee evaluated Mr. Johnson while he was experiencing severe lower back pain, weakness, and numbness in both legs – symptoms indicative of a potential neurological emergency.

35.    Despite these alarming symptoms, Dr. Lee failed to conduct or order any urgent diagnostic imaging, neurological consultation, or appropriate escalation of care to rule out serious spinal pathology, such as cauda equina syndrome.

36.    Instead, Dr. Lee admitted Mr. Johnson to the infirmary and prescribed Tramadol for symptomatic relief, thereby delaying diagnosis and treatment of an underlying condition requiring immediate intervention.

37.    Mr. Johnson was transported via wheelchair to the infirmary, where he remained under medical observation.

38.    Despite being completely non-ambulatory and showing signs of cauda equina syndrome, no imaging, lab work, or further diagnostic testing was ordered, nor was an emergency referral made.

39.    On June 22, 2023, Dr. Schuler evaluated Mr. Johnson during a 23-hour observation stay while he remained non-ambulatory and wheelchair-dependent, reporting ongoing severe back pain and lower extremity weakness.

40.    Despite these concerning findings, Dr. Schuler failed to initiate or order urgent MRI imaging, failed to refer the patient for neurosurgical or neurological evaluation, and failed to diagnose an emergent spinal condition.

41.    Dr. Schuler merely ordered analgesics, including Toradol and Tramadol, and arranged for non-urgent transfer to a long-term care facility, thereby further delaying appropriate medical intervention.

42.     By June 23, 2023, Mr. Johnson developed total loss of function in his right lower leg and foot drop.

43.     Mr. Johnson also reported urinary retention and severe constipation, which were hallmark symptoms of severe spinal cord compression, yet WCF and Centurion staff failed to take immediate action.

44.     Mr. Johnson's bladder was found to be hard and tender, requiring catheterization, but despite these alarming developments, no advanced imaging was ordered, and no specialist referral was made.

45.     On June 24, 2023, Dr. Bryan Wilson was contacted by nursing staff due to Mr. Johnson's urinary retention, which was a new and concerning symptom suggesting worsening neurological involvement.

46.     Dr. Wilson ordered placement of a Foley catheter and requested a urinalysis and urine culture but failed to consider or address the urinary retention in the context of Mr. Johnson's known lower extremity neurological symptoms and back pain.

47.     Even though Mr. Johnson's bladder was found to be hard and tender, requiring catheterization, no advanced imaging was ordered, and no specialist referral was made.

48.     On the same day, Mr. Johnson's right leg was also noted to be swollen, indicating deep vein thrombosis ("DVT") or vascular compromise, yet no Doppler ultrasound was ordered.

49.     On June 26, 2023, Mr. Johnson continued to experience severe constipation and difficulty urinating, but his condition was again minimized by WCF and Centurion staff.

50.     On June 29, 2023, Dr. Schuler ordered and reviewed lumbar spine X-rays to evaluate post-fall symptoms, which showed "straightening of the normal lordosis," but no MRI was performed.

51.     Despite worsening symptoms, Mr. Johnson remained at the correctional facility without advanced medical evaluation.

52.     Upon his release from WCF on July 5, 2023, Mr. Johnson went directly to Susan B. Allen Memorial Hospital ("SBA"), where he was evaluated in the ER.

53.     Mr. Johnson presented to SBA in a wheelchair, complaining of severe lower back pain, progressive neurological deficits, and urinary retention.

54.     An MRI of the lumbar spine revealed a large ventral epidural hematoma causing high-grade spinal stenosis.

55.     The failure of WCF and Centurion staff to conduct timely imaging and diagnostic testing directly resulted in Mr. Johnson's severe spinal cord compression and ongoing neurological deficits.

56.     SBA diagnosed Mr. Johnson with epidural hematoma, spinal stenosis, and urinary retention and determined that his condition required urgent neurosurgical intervention.

57.     Due to the severity of his symptoms and the lack of neurological services at SBA, Mr. Johnson was transferred via ambulance to Wesley Medical Center.

58.     Upon arrival at Wesley Medical Center, Mr. Johnson underwent further diagnostic workup, including a repeat MRI, which confirmed a large epidural hematoma causing severe spinal cord compression at L2-L3.

59.     On July 6, 2023, Mr. Johnson underwent a posterior lumbar decompression surgery.

60.     Following surgery, Mr. Johnson remained hospitalized at Wesley Medical Center for nearly a month due to ongoing neurological impairments, including, but not limited to:

    a.   Persistent right lower extremity weakness and partial paralysis.

        b.   Neurogenic bladder, requiring continued catheterization.

        c.   Difficulty with mobility, requiring a wheelchair and walker for ambulation.

        d.   Severe chronic pain in the lower back and legs.

61.    Upon discharge on August 3, 2023, Mr. Johnson required ongoing catheterization, physical therapy, and assistive devices for mobility.

62.    Following his discharge, Mr. Johnson continued to suffer from partial paralysis, chronic back pain, and bladder dysfunction.

63.    Additionally, Mr. Johnson required multiple emergency visits and hospitalizations due to persistent complications.

64.    Mr. Johnson remains dependent on intermittent catheterization and has suffered from multiple infections related to prolonged Foley catheter use.

65.    Defendants never provided Mr. Johnson adequate medical treatment, despite actual notifications of the need for medical intervention, and obvious and open symptoms, such as severe and persistent back pain, radiating pain down the right leg, difficult walking and ambulation issues, numbness and weakness in lower extremities, urinary retention, loss of bowel control and severe constipation, involuntary muscle shaking and spasms, falling and loss of coordination, that placed Defendants on actual notice of the need for medical intervention.

66.    Defendants did not abide by the Defendants' own non-discretionary rules for providing vital prescription medications to an inmate.

67.    Defendants did not abide by the Defendants' own non-discretionary rules for providing medical evaluations to an inmate presenting with an obvious need for evaluation.

68.    Defendants did not adequately train their employees to respond to medical emergencies; to recognize the occurrence of serious medical concerns; to obtain, offer and provide

medications; to monitor the inmates; to recognize health emergencies; or to refer inmates to medical providers.

69.     Defendants repeatedly ignored and dismissed multiple warning signs of a serious spinal condition.

70.     Despite the presence of symptoms of spinal cord compression and cauda equina syndrome, Defendants failed to, among other things:

  a.   Order timely and appropriate diagnostic testing.

  b.   Recognize and respond to progressive neurological deficits.

  c.   Provide emergency medical intervention.

  d.   Refer Mr. Johnson to a specialist, such as a neurologist, neurosurgeon or spine specialist.

  e.   Accurately document and communicate symptoms to higher-level medical providers, further delaying treatment.

  f.   Provide appropriate pain management.

  g.   Take Mr. Johnson's falls and physical decline seriously.

  h.   Properly evaluate and treat Mr. Johnson's urinary retention.

  i.   Address Mr. Johnson's bowel dysfunction and constipation.

  j.   Follow basic neurological examination protocols.

  k.   Recognize the medical emergency of cauda equina syndrome.

  l.   Monitor and/or increase monitoring of Mr. Johnson.

71.     Defendants' employees were at all relevant times acting in the interest of their employers and within their scope of employment.

11

72.    Mr. Johnson suffered from unnecessary and wanton infliction of pain because of the clear and deliberate indifference to his serious medical needs and the failure of Defendants to diagnose and treat his serious medical conditions. His injuries were the product of official policies, procedures, practices, customs, and actions collectively promulgated, tacitly authorized, and/or observed by Defendants.

73.    Defendants' policies, procedures, practices, customs, and actions - which, through the conduct and deliberate omissions of Defendants' personnel – were so persistent and widespread as to represent official policy and action recklessly disregarded substantial risk of serious harm to all inmates, including Mr. Johnson, and inflicted injuries actionable under 42 U.S.C. § 1983.

74.    Defendants' abdication of policy-making and oversight responsibilities, their collective and tacit authorization of personnel misconduct, and/or their inadequate policies, procedures, practices, customs, and actions - as well as their inadequate training, supervision, direction, and control that, if effective, would have eliminated those systemic deficiencies rose to the level of deliberate indifference and resulted in a constitutional injury that manifested itself in the unnecessary and wanton infliction of pain.

75.    More specifically, Defendants' inadequate policies, procedures, practices, customs, and actions - as well as their inadequate training, supervision, direction, and control of employees and agents that, if effective, would have eliminated those systemic deficiencies - permitted, *inter alia:*

    a.    Dismissing inmate medical complaints as fabricated;

    b.    Providing insufficient medical treatment for inmates;

    c.    Refusing to refer ill inmates to the hospital in order to save money;

d.  Hiring and rehiring medical and nursing personnel indifferent to the medical needs of inmates;

e.  Denying inmates medically necessary transfers to the hospital;

f.  Denying inmates necessary medical care;

g.  Hiring and rehiring personnel indifferent to medical emergencies;

h.  Utilizing conservative treatment methodologies unless or until a medical condition becomes emergent, in contravention of prevailing medical practices;

i.  Providing belated or untimely authorization of off-site specialty medical care and treatment;

j.  Delegating clinical determinations to personnel who are neither qualified nor licensed to independently make such determinations;

k.  Failing to inform inmates of their conditions and diagnoses and to permit them to participate in decisions involving their care;

l.  Failing to provide inmates with qualified medical opinions rendered by on-site and off-site physicians;

m.  Failing to train medical personnel and nursing staff;

n.  Failing to make timely referrals for offsite specialty medical and diagnostic services, even when the need is obvious to a lay person and both medically necessary and appropriate;

o.  Belated or untimely authorizations of offsite specialty medical care and treatment;

p.  Discouraging medical and nursing personnel from making referrals for offsite specialty medical services;

q.  Improper application of evidence-based clinical guidelines for the purposes of denying and/or delaying medical care;

r.  Delaying or not responding to urgent and/or debilitating conditions;

s.  Failing to ensure inmates have timely access to care and to medical personnel who are qualified to diagnose and treat;

t.  Failing to provide cogent nursing directives for prioritizing requests for medical services and sick calls;

u.  Failing to ensure medical/nursing staff competency, including the establishment of policies, procedures, and processes to detect and respond to incompetency;

v.  Poor quality nursing, including failures to note urgencies, detect progressively degenerating conditions, and noting conditions that require further evaluation and treatment;

w.  Delegation of clinical determinations to nursing personnel who are neither qualified nor licensed to independently make such determinations;

x.  Failing to provide continuity of care by not documenting clinical observations, not properly diagnosing medical conditions, and not providing adequate treatment;

y.  Failing to maintain adequate medical records by maintaining some in hard copy/paper format and others in a digital format;

z.  Failing to properly monitor inmates;

14

aa. Failing to meet widely accepted community standards of care with regard to medical services for ill and/or injured inmates; and/or

bb. Failing to provide vital prescribed medications.

76.     As a direct result of the Defendants' conduct, Mr. Johnson suffered severe and persistent back pain, radiating pain down the right leg, difficult walking and ambulation issues, numbness and weakness in lower extremities, urinary retention, loss of bowel control and severe constipation, involuntary muscle shaking and spasms, falling and loss of coordination; permanent neurological damages, including, but not limited to, partial paralysis in his right leg, chronic pain, and neurogenic bladder; suffered emotional distress, pain, and mental anguish.

77.     Had Defendants ordered timely imaging and transferred Mr. Johnson for neurological evaluation when symptoms first appeared, his permanent injuries could have been avoided.

78.     The systemic deficiencies listed above are the product of official policies, procedures, practices, customs, and actions that were promulgated or tacitly authorized by the Defendants' personnel vested with final decision-making authority - and all of them caused or materially contributed to the systemic and deliberate indifference to Mr. Johnson's serious medical needs, and the unnecessary and wanton infliction of pain he experienced.

79.     Defendants' official policies, procedures, practices, customs, and actions, which are the moving force behind Mr. Johnson's injuries, operated to deprive Mr. Johnson of the right to adequate and appropriate diagnosis of his serious medical conditions.

80.     Collectively Defendants' acts and omissions not only contemplate a reckless disregard of substantial risks of serious harm to inmate health and safety, but said acts and

omissions are also sufficiently harmful to evidence deliberate indifference to the serious medical needs of Mr. Johnson and the other inmates in their charge.

81.    Defendants engaged in the preceding conduct with deliberate indifference to Mr. Johnson's rights, safety and well-being.

82.    At all relevant times, the conduct of all Defendants was in willful, reckless, and callous disregard of Mr. Johnson's rights under federal and state law.

<u>**COUNT I: 42 U.S.C. § 1983 – EIGHTH AMENDMENT**</u>
<u>**DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEED**</u>
**All Defendants**

83.    Plaintiff hereby incorporates the foregoing pleaded facts as if fully restated herein.

84.    As a detainee, Mr. Johnson was completely reliant upon Defendants to protect him and provide for his medical needs.

85.    Defendants owed Mr. Johnson a non-delegable duty of reasonable care while he was in their custody.

86.    Defendants Zmuda and Snyder possessed a non-delegable duty to supervise and provide proper care to Mr. Johnson.

87.    Centurion assumed a corresponding duty to Mr. Johnson when it contracted with the State of Kansas to furnish medical care to detainees.

88.    Defendants possessed actual knowledge, personally and/or via its employees and agents, that Mr. Johnson was in need of medical intervention because:

    a.  They knew he was injured on June 9, 2023.

    b.  They knew he was experiencing severe and persistent back pain, which worsened over several weeks.

c. They knew he had pain radiating down his right leg, which intensified over time.

d. They knew he had experienced difficulty walking and ambulation issues to the point of requiring a wheelchair and other assistive devices.

e. They knew he had experienced numbness and weakness in his lower extremities to the point of losing complete function in his right leg below the knee.

f. They knew he had experienced urinary retention, which worsened over time, requiring catheterization.

g. They knew he experienced loss of bowel control and severe constipation.

h. They knew that he needed to be assessed for medical care because he was pale and shaking due to pain.

i. They knew he had experienced falls and worsening coordination.

j. They knew he was completely dependent on a wheelchair by June 23, 2023.

89.    Defendants breached their duty of care by:

a. Failing to order timely and appropriate diagnostic testing.

b. Failing to recognize and respond to progressive neurological deficits.

c. Failing to provide emergency medical intervention.

d. Failing to refer Mr. Johnson to a specialist, such as a neurologist, neurosurgeon or spine specialist.

e. Failing to accurately document and communicate symptoms to higher-level medical providers, further delaying treatment.

f. Failing to provide appropriate pain management.

g.  Failing to take Mr. Johnson's falls and physical decline seriously.

h.  Failing to properly evaluate and treat Mr. Johnson's urinary retention.

i.  Failing to address Mr. Johnson's bowel dysfunction and constipation.

j.  Failing to follow basic neurological examination protocols.

k.  Failing to recognize the medical emergency of cauda equina syndrome.

l.  Failing to monitor and/or increase monitoring of Mr. Johnson.

m.  All other ways that may be discovered throughout the case.

90.    Defendants Gumm, Lee, Schuler, Wilson, and other as yet discovered employees under the supervision of Defendants Zmuda, Snyder and Centurion, were at all times acting in furtherance of their job duties and within the course and scope of their employment and/or agency.

91.    The employees of Defendant Centurion were at all times acting in furtherance of their job duties and within the course and scope of their employment and as agents of Defendants Zmuda, Snyder and Centurion.

92.    Defendants engaged in the preceding conduct with deliberate indifference to Mr. Johnson's rights, health, safety and well-being, and violated Mr. Johnson's rights under the U.S. Constitution.

93.    The acts and omissions of Defendants were intentional, wanton, malicious, and oppressive.

94.    Defendants acted under the color of state law to deprive Mr. Johnson of his rights under the U.S. Constitution.

95.    As a direct and/or contributory result of Defendants' conduct, Mr. Johnson suffered weeks with an untreated, spinal cord injury; suffered severe and persistent back pain; suffered radiating pain down the right leg; difficulty walking and ambulation issues; numbness and

weakness in lower extremities; urinary retention, loss of bowel control and severe constipation, involuntary muscle shaking and spasms; falling and loss of coordination; permanent neurological damages, including, but not limited to, partial paralysis in his right leg, chronic pain, and neurogenic bladder; suffered emotional distress, pain, and mental anguish.

## COUNT II: 42 U.S.C. § 1983 – SUPERVISORY LIABILITY
### Defendants Zmuda, Snyder and Centurion

96.     Plaintiff hereby incorporates the foregoing pleaded facts as if fully restated herein.

97.     Defendants Zmuda, Snyder and Centurion each had supervisory responsibilities over one or more of the medical and/or nursing staff who provided deliberately indifferent care to Mr. Johnson.

98.     Defendants participated in violating Mr. Johnson's constitutional rights, directed others to violate them, or, as the person or entity in charge, had knowledge of and acquiesced in his or her subordinates' violations.

99.     Defendants engaged in the preceding conduct with deliberate indifference to Mr. Johnson's rights, health, safety and well-being, and violated Mr. Johnson's rights under the U.S. Constitution.

100.     The acts and omissions of Defendants were intentional, wanton, malicious, and oppressive.

101.     Defendants acted under the color of state law to deprive Mr. Johnson of his rights under the U.S. Constitution.

102.     As a direct and/or contributory result of Defendants' conduct, Mr. Johnson suffered weeks with an untreated, spinal cord injury; suffered severe and persistent back pain; suffered radiating pain down the right leg; difficulty walking and ambulation issues; numbness and weakness in lower extremities; urinary retention, loss of bowel control and severe constipation,

involuntary muscle shaking and spasms; falling and loss of coordination; permanent neurological damages, including, but not limited to, partial paralysis in his right leg, chronic pain, and neurogenic bladder; suffered emotional distress, pain, and mental anguish.

**COUNT III: 42 U.S.C. § 1983 – DELIBERATE INDIFFERENCE
IN FAILING TO TRAIN/SUPERVISE**
**Defendants Zmuda, Snyder and Centurion**

103.    Plaintiff hereby incorporates the foregoing pleaded facts as if fully restated herein.

104.    Defendants Zmuda, Snyder and Centurion owed Mr. Johnson a duty to keep him safe while he was in their custody.

105.    Defendants knew or should have known that its employees were not properly trained to identify the hallmark signs of a spinal emergency; were not properly trained on the urgency of imaging and specialist referral when a patient has progressive neurological deficits; were not taking medical complaints seriously; were not effectively providing medications to inmates; were not conducting appropriate neurological assessments; were not properly documenting and accurately communicating medical symptoms; were not transferring patients to an outside hospital, delaying essential intervention; were not effectively working with the employees of Defendant Centurion to provide medications or identifying the need for medical evaluation or intervention.

106.    Defendants knew or should have known that their employees and/or agents had not been conducting physical checks on inmates at the proper and safe frequency; had not been identifying and reporting the need for medical evaluations; had not been conducting appropriate assessments; had not been identifying inmates in need of elevated medical care; and had not been effectively identifying medical emergencies requiring hospital transfer.

107.    Defendants knew or should have known they had not properly trained their employees and/or agents on how to monitor for, identify and report spinal cord injury.

108.    Defendants knew or should have known they had not properly trained their employees and/or agents on how to be vigilant for, identify and report a need for a medical evaluation.

109.    Defendants knew or should have known their employees and/or agents had not been trained on any protocol for providing detainees appropriate neurological assessments.

110.    Defendants knew or should have known their supervising physician(s) had not been adequately trained on how to properly monitor their practice of medicine.

111.    Defendants knew or should have known that they had not properly trained their employees and/or agents to identify vital inmate prescribed medications, obtain those medications, and provide those medications to inmates.

112.    Defendants knew or should have known that they had not properly trained their employees and/or agents to identify health emergencies.

113.    Defendants knew they were not providing sufficient supervision to their employees, agents and contractors working at WCF.

114.    Defendants failed to properly supervise their employees and/or agents by allowing grossly inadequate and deliberately indifferent medical care to be provided to Mr. Johnson, including, but not limited to, the following failures:

        a.  Defendants did not provide an adequate medical evaluation after his injury on June 9, 2023.

        b.  Defendants did not order timely and appropriate diagnostic testing.

c.  Defendants did not recognize and respond to progressive neurological deficits.

d.  Defendants did not provide emergency medical intervention.

e.  Defendants did not refer Mr. Johnson to a specialist, such as a neurologist, neurosurgeon or spine specialist.

f.  Defendants did not accurately document and communicate symptoms to higher-level medical providers, further delaying treatment.

g.  Defendants did not provide appropriate pain management.

h.  Defendants did not take Mr. Johnson's falls and physical decline seriously.

i.  Defendants did not properly evaluate and treat Mr. Johnson's urinary retention.

j.  Defendants did not address Mr. Johnson's bowel dysfunction and constipation.

k.  Defendants did not follow basic neurological examination protocols.

l.  Defendants did not recognize the medical emergency of cauda equina syndrome.

m.  Defendants did not monitor and/or increase monitoring of Mr. Johnson.

n.  All other ways that may be discovered throughout the case.

115.    Following Mr. Johnson's injury, Defendants possessed actual knowledge that he had sustained a serious back injury, was experiencing severe and worsening pain, had symptoms consistent with spinal cord compression, and required urgent medical evaluation and treatment to prevent permanent neurological damage.

116.    Defendants knew or should have known that their employees were inadequately

supervising Mr. Johnson's medical care and that such failures would cause serious harm.

117.    The foregoing training and supervisory failures breached a duty of care Defendants owed Mr. Johnson.

118.    The employees of Defendants were at all times acting in furtherance of their job duties and within the course and scope of their employment.

119.    Defendants knew or should have known that their employees were inadequately trained to handle Mr. Johnson's medical care and that such failures would cause serious harm.

120.    Defendants had previously been warned – through medical literature, inmate complaints, and prior lawsuits – that failure to train medical staff in correctional facilities results in delayed diagnoses and preventable permanent injuries.

121.    Defendants have a policy, pattern, and practice of inadequately training their employees to provide adequate and sufficient health care.

122.    Defendants have a history of widespread failure to provide adequate medical care to serious medical needs and/or prior similar incidents which put them on notice of the need to adequately train on the foregoing.

123.    Additionally, Defendants had a policy, practice, and/or pattern of understaffing medical and nursing staff.

124.    Defendants were aware of such systemic understaffing at WCF and further knew that it was deleteriously impacting jail operations, including, but not limited to, by making them unable to adequately and timely assess the serious medical needs of detainees, including Mr. Johnson.

125.    Defendants tolerated a culture of indifference toward inmate medical care, failing to correct obvious lapses in training even as Mr. Johnson's condition deteriorated.

126.    Defendants engaged in the preceding conduct with deliberate indifference to Mr. Johnson's rights, health, safety and well-being.

127.    Defendants acted under color of state law to deprive Mr. Johnson of his rights under the U.S. Consititution and, therefore, violated 42 U.S.C. § 1983.

128.    As a direct result of the Defendants' conduct, Mr. Johnson suffered weeks with an untreated, spinal cord injury; suffered severe and persistent back pain; suffered radiating pain down the right leg; difficulty walking and ambulation issues; numbness and weakness in lower extremities; urinary retention, loss of bowel control and severe constipation, involuntary muscle shaking and spasms; falling and loss of coordination; permanent neurological damages, including, but not limited to, partial paralysis in his right leg, chronic pain, and neurogenic bladder; suffered emotional distress, pain, and mental anguish.

## PRAYER

WHEREFORE, Plaintiff prays for judgment against Defendants on all claims asserted herein and respectfully requests that the Court award compensatory damages for past and future medical expenses, pain and suffering, emotional distress, loss of mobility, and permanent disability; economic damages for lost wages and diminished earning capacity; punitive damages due to Defendants' reckless indifference to Plaintiff's serious medical needs; attorneys' fees and litigation costs as permitted by law; pre- and post-judgment interest; and any such further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff requests trial by jury as to all triable issues.

Respectfully submitted,

/s/ Ben Stelter-Embry
Ben Stelter-Embry       KS #25891
Embry Law, LLC
4700 Belleview, Suite 300
Kansas City, MO 64112
ben@embry-law.com


Michael P. Waddell      KS#13272
Injury Law Associates
701 E. 63rd, 3rd Fl.
Kansas City, MO 64110
mwaddell@accidentlawkc.com

**ATTORNEYS FOR PLAINTIFF**